Carolina, and Mr. Dunn, whenever you're ready, we'll hear from you. In the District Court's order dated January 22, 2014, wherein the District Court reversed her previous ruling granting qualified immunity to Chief Cook and Town Manager Brawley, the law enforcement chancellor. That statement is incorrect. In fact, under North Carolina law, there are two state offices authorized to direct investigations by the State Bureau of Investigation. Those offices are the Office of the Attorney General and the Office of the Governor. The Mocksville police officers who are the plaintiffs in our lawsuit called both of those offices. The Attorney General's office suggested that the officers go to the local authorities. The officers chose not to do that. They chose instead to call the Governor's office. And it is that call to the Governor's office which forms the basis of their First Amendment retaliation claim. The undisputed evidence on record is that the purpose of the officers' calls to the Governor's office was to report behavior by the Chief and others in the department that they believe constituted crimes. Well, some of it. Some of it may not have constituted crimes. The only item of which there's evidence that does not constitute a crime was the officers' concern about racially discriminatory practices in the department. Now, as to... And you maintain this is part of their duty. This is what they do. I maintain that Garcetti v. Ceballos asked us to undertake a practical inquiry regarding the nature of this speech. And when we look at it... So my question again is you maintain that what they did was no more than what they do as officers. I maintain that in making the call... Is that a yes or a no on that? Or does it need to be clarified? The answer is yes. In making the call, they acted as police officers, and they do what police officers do for a living. So if they'd called a newspaper, they'd be in a whole different ballgame. I think that's a good way to put it. What we ought to do is encourage officers who are facing this kind of thing, don't call the Governor, don't call the Attorney General, because, you know, you get fired on this thing and there's no hope for you. Just call the newspaper. You identify a tension... My question is, is that what we are seeing as a result of this? Because I take it if they called a newspaper, then we have a different analysis. Is that right? I think that's right. I think that's exactly right. So what they should have done is called a newspaper. It would be a different case if they had called the newspaper. And Justice Stevens mentions that in his dissenting opinion in Garcetti v. Ceballos. He points out the irony or the fairness in creating a rule where an employee's incentive is to go public with a complaint rather than first speaking candidly with his superiors. Except that sort of puts the focus in the wrong spot. The question here is whether they were speaking as citizens or as employees. And the law divides the two, saying that even though they have a legitimate claim when they're speaking as employees, that's not a First Amendment issue. Whereas if they speak as citizens, it is a First Amendment issue. So it's not an incentive where to speak or where to complain. Obviously, discrimination and corruption and so forth have to be addressed and should be. But the question then comes is, was it clearly established they were speaking as citizens or as employees? I think that's right. I think that what Garcetti does is establish... What's right? He's right that what Garcetti establishes is a threshold inquiry. I want to get back. I'm trying to understand where it's going because the end result is whether you are trying to establish they're speaking as officers, clearly if they go to their superiors or they go to people within the department, that's one thing. But to go outside, whether it's to the governor's office, the attorney general, whomever, what you are essentially the end result, regardless of how we want to posture this in terms of all the officers or not, is you are saying to every officer in this country, don't you ever go and report anything to the governor if you find corruption or something that is amiss. Because this is the worst case scenario. I mean, this is absolutely horrible what's on this record here of what's going on within this department here. The kind of activity is something somebody had... And I think you can at least accept the three officers here are the good officers in the department. And so these three good officers, when they go to the governor or they go to the attorney general, they're acting as officers. But if they do what the case law says, go to a newspaper and put it out on the street, oh, then they're okay. Is that the end result? That is the end result. Okay, that's what I'm trying to put in the process. And I understand the law in terms of what the demarcation is. But I think the question comes down to, is this what is referred to as acting within your duty? And does it matter if they thought they were speaking as citizens? Does that matter? I think the key here is that the report was made to a law enforcement agency. They, the officers, using their experience as officers to know that crimes have been committed, using their discretion and judgment as officers to know where is the appropriate place to report that crime, called the attorney general... Let me ask one other question, and I'll let it go out, but I do want to know this answer. And that is, there are, I think we all accept, certain duties that officers perform that only officers perform. You can put your blue light and stop people, you can run warrants, you can do a lot of things. Then there are things that probably an officer can do and other folks can do. If what they did, if an ordinary citizen saw this corruption going on, would they be, I mean, would they, are they okay going and telling the governor that this is going on too? Well, an ordinary citizen who's not an employee of the police department does not implicate the department's interest in maintaining order in its ranks. There's no order going on in this department. There's completely chaos in there is what's happening. They're not trying to keep order in the ranks. They're trying to establish some order in this ranks. In the ranks, the normal, what this rule has set is for the normal course of activity, that if you've got a good department, go through your chain of command like in the military and do what you're supposed to do. But if you've got a problem and it's corrupt internally, how do you deal with that? I mean, to end up saying, okay, qualified immunity, now you can't do anything. And you've been fired for what you just said. And the people that fired you have qualified immunity because they did what they were supposed to do, go and talk to the governor. The governor did nothing and so boom, now you get fired. Assuming that everything that the officers reported was true, then absolutely this is exactly the type of behavior that we as a society want to be reported and investigated, rooted out. It is indeed, isn't it? I mean, that behavior is exactly what you wish and hope somebody will report. Yes, it is. Yes, it is. And the question before us today is whether the Constitution of the United States presents the remedy for these officers. And under Garcetti v. Sobolos, the answer to that question is no. And the reason is because what Garcetti stands for is that speech- Well, is that the question or is the question, under these facts, is it that the people he because they are immune? Well, there are two questions. First is whether the individual defendants are entitled to qualified immunity. And that rests on whether the asserted right was clearly established at the time the employment decision was made. But the first element of the qualified immunity analysis is whether there was a constitutional violation at all. First instance. And this is where Garcetti compels us, as uncomfortable as it may be, to conclude that speech made pursuant to the officer's official duties, speech that the officers made as officers, which is quintessentially what they were doing in reporting crimes to a law enforcement agency, is unprotected by the First Amendment of the United States. There are several key components of this particular case that compel this result that distinguish it from other similar cases. And you've already highlighted one of them. One, and it's a significant one, is that these reports were made exclusively within the criminal justice system and not to the media. It's not the proverbial letter to the editor. It's not like some of the cases that this court has decided in the past where packets of material were mailed out to several news organizations. Rather, these complaints were, although they were taken outside the town chain of command itself, that was the result of the officers using their discretion determining where appropriately the crime should be reported. It is exactly what we pay our police officers to do. It is significant in this case that in calling the governor's office, the officers, while choosing to remain anonymous, did identify themselves as police officers. And so they themselves, in making the speech at Garcetti v. Ceballos, and recognizing the countervailing considerations that the dissenting opinions in Garcetti discuss, the speech of these officers in calling the governor's office was simply unprotected under the First Amendment. Thus, the first element of our qualified immunity analysis is not satisfied. There was no constitutional violation. We then turn to whether, if there were such a right, was it clearly established at the time the chief made the decision to terminate these officers' employment? The district court relies exclusively on this court's decision in Durham v. Jones in reversing herself. And where she once granted the chief and the town manager qualified immunity, following the decision in Durham v. Jones, she decides that they're not entitled to qualified immunity and that, in fact, the plaintiff's constitutional right was clearly established when they were terminated. In fact, however, Durham v. Jones did not analyze this threshold Garcetti issue at all. There's no question that the employee spoke as an employee or spoke as a citizen. And this is a threshold issue that must be answered in our case. And when you say spoke as a citizen, are you saying spoke as one who has a public concern? I think that's a separate inquiry. I think we first decide whether an employee spoke pursuant to his duties as a public employee. And if so, we then proceed to decide whether the subject of that speech was a matter of public concern. What Garcetti did essentially was make what had previously been treated essentially as one element into two. Durham v. Jones doesn't do that. And what the district court... What Garcetti was basically doing is saying that employees who complain about their employee workplace cannot rely on the claims unless they detach themselves from the employment. Either go out and do picketing or go to the newspaper or run for office or give a public speech somewhere. But if they're acting within the employment situation, Garcetti basically says it's not... As bad as it is, it's not a First Amendment problem. I think that's right, Your Honor. Thank you. All right. We have... I guess we have next Mr. Elliott. Yes. Now let me ask how this is going to work. Are you going to handle the cross-appeal too? Your Honor, I'm handling the qualified immunity argument. My co-counsel Ms. Parsonage is handling the municipality... Fair enough. Okay. I am Robert Elliott from Forsyth County, North Carolina. And Helen Parsonage and myself do represent the plaintiffs in this case. Our clients are three career police officers who have a combined service to the Knoxville Police Department of almost 50 years. None of that makes any difference to you. They can be angels. And from the record, it looks like they were angels. But under the facts of this case and as the law, as we're being put forth here, we've got to make a determination. Were they speaking as police officers and not entitled to qualified immunity? I think the record shows clearly that they were speaking as citizens. Under the rules of Garcetti, it's a very different fact situation. Tell me why they... Why? Well, I mean, if we're going to apply Garcetti, I think there's a real question of whether Garcetti is applicable. And that's maybe why the  Nunes case doesn't analyze Garcetti but analyzes Andrew versus Clark. So these are clearly matters of public concern. My plaintiff... Our clients clearly went outside of their department to complain about it. They clearly went to an elected official, the governor... They didn't exactly dress themselves up in uniform and go up and walk up to the governor's office and say, hey, this is who we are. We're making a complaint. They did everything they could not to be You know, none of this... It seems to me the arguments I'm hearing today are focused on issues that... This is... Your clients probably were angels relatively in this case. I mean, there was a lot of problems as Judge Wynn has pointed out. The question here is whether we have a First Amendment claim, a person speaking out and is entitled to First Amendment protections against otherwise legitimate functions. These were employees at will. And they could have been fired at will for any reason as long as it's not against public policy, I suppose. But... And maybe there is a wrongful termination claim. I don't know. But the question here is whether this is a First Amendment claim. And when employees complain about the employee workplace, traditionally that's not a issue is. And so I think the difficult issue in this case is whether they were speaking as citizens or as employees. And it looks to me like they wanted to try to protect themselves. But whether it's clearly established that they were speaking as citizens, that's the close call in this case. Well, they did what the plaintiff in Andrew did. They did what the plaintiff in Durham v. Jones did. They went outside their department to complain of matters of public concern. Now, if you apply Garcetti, you're looking at the practical job duties. And if you apply... If you look at our plaintiff's practical job duties, none of them included going to the governor to report misconduct on the part of their chief. In fact, defendants have shown no evidence of that fact. The defendants have shown no evidence that these clients... What about if they didn't? I know they didn't, but that wouldn't be a First Amendment claim. That wouldn't be a First Amendment claim. That wouldn't be a matter of public concern. Well, that's another issue. But if they weren't, they would be speaking as employees about the workplace. And the public concern, I think everybody agrees that this was a matter of public concern. And they have reported matters of public concern. I think everybody can agree on that and the defendants have. Well, I want to deal with the office too hot type issue because I think it's important to understand we're talking about the integrity of a system. And it does not affect the integrity of a system to say the office is too hot, so what? Then go tell your supervisor. But if the supervisor is corrupt, he's misusing funds, he's racist, he's trying to be a police officer when he's not supposed to be, he's doing all kinds of stuff he's not supposed to be doing, and you know that the system is corrupt and is an integrity of it, are we then to say he's acting as an officer when he goes and tells the governor or someone else and he's trying everything, they're trying to do everything they can not to be identified because they know what's going to happen. They're going to be retaliated against from their perspective. They're not going to have a job. And they're trying not to do these things. And are we to say well, this is like when he's saying the office is hot. If he runs off to the governor, he's forming a job as a police officer. These are precisely the kind of issues that the First Amendment is designed to protect and has been held to protect is these matters of public concern. Garcetti involved a disagreement between the plaintiff and his superior. And it basically was a disagreement as to how to interpret his own job duties. That's what Garcetti and that was an extension of Connick. Connick involved those types of issues that Judge Niemeyer that you bring up. This case is different. This case is much more like Andrew and Durham. And whether or not Garcetti ultimately applies, these plaintiffs went outside their department to report issues of public concern and they did so in a way that indicates that they were not acting as employees. In fact, the record shows that not only did the defendant not produce any evidence showing that they were acting in their official duties, the record shows that they were not acting in their official duties. If you look at the personnel policies of the police department, it says clearly that any reports of wrongful misconduct on the part of any member of the police department indicates that they were going outside their job duties. They would have violated four or five different provisions of the personnel policies which say, in Garcetti, the Garcetti court said, in a practical inquiry, we look at what this plaintiff was employed to do. What he was expected job, he was expected to perform. If you go to the personnel policies, at the Joint Appendix 387, it said the purpose of these policies is to provide a basis of the performance of duty which is expected of personnel. So these policies are what are expected. What if the facts in this case were that the violations of misconduct and the like were by subordinate officers, not by the assistant chief, but by subordinate officers? The assistant chief considered the claims and rejected them. And then the officers went to the governor's office because they were unhappy with that result. Do they still have a First Amendment claim in that case? I think they very well could. And I think that gets into the public issue, the matter of public concern analysis. Well, what about, well, I guess it also implicates the question of discipline and efficiency within the department. Well, then the disruption issue could come up in a pickering balance. Okay. All right. But that didn't come up here because, of course, our clients were terminated because they were discreet, because they did it the responsible and the right way. They were terminated before it was even known. So the disruption element never came up and never would have come up if there had been an independent investigation. The personnel policies that I've alluded to are very specific on what a member of the department should do in his official duties. And Ms. Parsons will be talking about it. But what the personnel policies say is that if there's anything, if a member needs to report any misconduct, they go within the command structure and up to the chief. What is the, if the chief of police is the corrupt person and in collaboration with the town manager, it seems to me the state FBI, so to speak, or the state law enforcement, what is it? SBI. SBI and the governor are appropriate places to go. Well, the governor is not the place to go. The governor is an elected official. The fact that by the, through the executive branch, they're somewhat. Out of the various agencies, state agencies, I mean, control the SBI and all the others? Yes, sir. And it's not the governor. I mean, a governor has ultimate. Why do you think they went to the governor and the SBI as opposed to the newspapers and articles and give speeches on the radio and stuff saying this needs to be taken? I think they saw the value of being responsible in this situation and trying to help their department. Well, it's not a responsibility. It's a question of the method, whether they were speaking as citizens or speaking as employees. And the treatment under the First Amendment is different. It doesn't mean one's better or the other. It seems to me it has to be addressed and the SBI can address it. Federal officials can address it if there's corruption. There's all kinds of avenues to address this type of thing. But to get protection by reason of the First Amendment, that's all we're talking about here in this case. And by bringing up issues of public concern outside of the department, they're doing exactly that. And there's just absolutely no evidence they're carrying out their official duties in doing that. Because these personnel policies, it was never authorized by the chief. It's their duty to root out corruption within their department and within their employment? That certainly can be a duty, but the question is how do they carry out their duty? When we look in at our First Amendment analysis, how do they carry out that duty of rooting out corruption, reporting racism? Under the First Amendment, there's a societal value in having racism and other matters of public concern exposed. And how an officer tends to do that will determine whether he has exercised his First Amendment rights. And going outside the official job duties that are expected of him and for which he has been hired, is exercising his rights as a citizen on behalf of the community. And why was that clear as of September 2009 as a matter of law? Because Andrew v. Clark made it clear. Not Jones? Jones recognized that Andrew v. Clark made it clear prior to our terminations in 2011. What did that opinion say? Which one? Andrew v. Clark involved a police officer with the Baltimore Police Department who was on the perimeter guarding a housing project where a resident had barricaded himself. He called the SWAT unit. The SWAT unit came and killed the man. There was a question of excessive force in Andrew's mind. Andrew circulated an internal memorandum. But in analyzing under Garcetti whether or not he was exercising his First Amendment rights or whether he was carrying out official duties, this court said he did not have any responsibilities to circulate this memorandum. He had never done so in the past. He didn't have any responsibilities under internal investigations. He did so as a citizen. And at that point, he did go outside the department. He ultimately gave it to the media. But every one of those factors, when applied to this case, comes out with the same conclusion. Every one of those factors. Whether our clients didn't have any responsibility to go to the governor for anything and have never been to the governor. That's the only place that can redress the chief of police. The hypothetical that Judge Diaz gave you was what if you had lower level? Then you would expect to go to the chief. The chief himself is the object of the complaint. The next level is some state agency. Well, I suppose you could say he could have gone to the district attorney. They were avoiding the local authorities because they were all cronies with the chief. And so they went to the best place they could go. They tried the attorney general. They went to the NAACP first. The best place they can go. As citizens. Well, now as citizens the best place to go is to make a public statement to the newspapers. Well, then you're kind of locking in to what they're saying. That the only way they can exercise. I'm just suggesting whether we're talking about First Amendment rights. Yes, sir. I understand. Or whether we're talking about employee rights. I mean, basically these people were at will employees, right? But protected by the First Amendment. And Durham v. Jones and Andrew v. Clark are right on point. Well, they could have been protected also by whistleblowing statutes and so forth. Well, they weren't. I mean, that's not really the issue here. It's not the issue here, clearly. The issue here is whether they're protected by the First Amendment for the very reasons Judge Wim stated earlier. I mean, there are policy arguments because there is societal value in what they're reporting. And the people they go to is not so important as whether it's part of their official duties. If you buy into the Garcetti analysis. And there's just no argument that they were carrying out their official duties under Garcetti. It is a practical inquiry. It is a way to look at what they ordinarily do in the course of their duties as police officers. And none of these police officers were allowed to go outside the department to do anything. They had to be assigned to a case. They had to, any investigations that were initiated were done with the approval of the chief. The chief never authorized them to go outside the department for anything. You think that an employee who discovers crime in his workplace, that is a crime committed by the chief, should go to the chief? Should he go to the chief? Well, I think that's a problem. Yeah, it's a problem. Yes, sir. But the real question is the fact that he doesn't go to the chief and he goes outside the department, shouldn't he have First Amendment protection because he is acting as a citizen when he goes to the government? It depends where he goes. Sir? It depends where he goes and what he says. I don't think it's that semantical. I don't think that's what Garcetti says with all due respect. That's what the First Amendment says. Sir? That's what the First Amendment says. Well, Garcetti interprets the First Amendment. And if you analyze Garcetti in that manner, which Andrew and Durham certainly did not in this court, if you analyze in that manner, then the limitation of Garcetti eats up the rule. We don't have a First Amendment for people like this. And I don't think that … I'm not sure the case law was ever thought to be used, even in Garcetti, that under these circumstances where you almost have a rule of necessity, you cannot report it to the people that you say are doing the conduct. You've got to take it somewhere. As an officer, you have jurisdiction to arrest people for crimes and things within your territory. They go outside of their jurisdiction, so to speak, to report this and to try to do it in a very civilized way. And the end result is that the officials there are entitled to qualified immunity such that they can retaliate against them. That cannot be what that law was set up there for in the first instance, to give them qualified immunity to retaliate for reporting them. And I don't think that is what the law is. I don't think there's any support for their position that the media makes all the difference in the world and it's the only way that they can act as citizens. Citizens call the governor all the time. The governor is an elected official who encourages people to come to the governor. And that's what my clients were doing. What if the clients discovered this and went to the chief and said, we know you're committing crimes, we don't like discrimination in the workplace, and we're going to go to the governor? And the chief says, you're fired, out you go. I would contend they have First Amendment protection. Is that First Amendment right? Sir? Are they protected then? I would contend they have First Amendment protection, but that is a different issue. You mean they're talking to the officer himself? Yes, they go to the chief and they say, you've been a racist in this department. Right. And we are going to the governor and he terminates them. They have reported an issue, a matter of public concern, that Garcetti was not intended to limit. Garcetti really had to do with – But you've got a tougher case under that scenario Judge Niemeyer just described. He's basically saying that's exactly what their duties are, to go to that chief and tell him things and report crimes, even if it's the chief himself. That's not what they did here. Right. So that's what takes it as a different case. I don't know if you need to go and, you know, try to argue that case. That might be a case that we'll deal with in the future, but I wouldn't go there. I think Judge Niemeyer set up a good situation. You don't want to have to argue that today. All right, sir. That's not your case. All right. Why don't we hear from Ms. Parsonage. Thank you. I think she's next up. Thank you, Your Honors. May it please the Court, my name is Helen Parsonage. I'm here for the plaintiffs on the single issue of municipal liability. It's opposition that the district court judge erred when she misapplied one phrase from the Propotnick case. That case held that a federal court would not be justified in assuming municipal policymaking authority lies somewhere other than where the applicable law propels to put it. Where the error is that the plaintiffs are not asking the court to assume that policymaking authority lies other than the statute provides. We are arguing that the evidence in this case shows that it clearly did. The defendants rely on the North Carolina General Statute 160A-164 for the proposition that there is a statute in North Carolina that puts the policymaking in the hands of the municipality and therefore we can't assume it was anywhere else. Firstly, that statute uses the term may. It does not require that the municipal authority have statutes or ordinances rather for personnel. It's just a permissive statute. And what we have here in the testimony at deposition is clear evidence that as of the end of the 1980s the town of Mocksville repealed its personnel ordinances. So if this case had come up in 1985, then we'd be talking about a different situation because the town of Mocksville had policymaking on personnel and they had retained that for themselves just like the municipalities in Crowley and in the Firefighters v. Greensboro case. But we don't have that situation anymore because in approximately 1988, the town of Mocksville repealed its personnel ordinances and according to both the town manager and the chief of police, they delegated the responsibility and the authorization to make personnel policy to the town manager and to the chief of police. I thought the delegation was to the town manager and the town manager in turn delegated to the department. That's correct. But I guess the dispute is exactly what was delegated by the town manager. What's the evidence that the town manager delegated policymaking authority as opposed to simply the authority to implement day-to-day decisions with respect to hiring and firing? First of all, the town manager testified at deposition that she delegated the personnel to the chief of police. All that means is that he had the authority to hire and fire. Well, I think that sometimes we make a distinction between hire and firing and personnel policy that may not be there, Your Honor. The chief of police in this case had a set of policies for which, which gave grounds for termination. Those were personnel policies. That was not just a simple hire and fire decision. I thought he had to seek authorization from the town manager. The town manager had an ultimate up or down decision on his termination, yes. But the policies that he terminated, the violation of policies that he terminated the officers for were his own policies, which he put out in a manual. I just draw the court's attention to Joint Appendix 362, which is the cover page of the police manual where it says that it's issued under the authority of the police chief and subject to his interpretation. And that was issued in 2005. So we've got very clear indication that the town had no policy manual. The town had no personnel manual. They left a vacuum. Well, that doesn't matter. The question is who has policymaking authority, isn't it? Well, the policies clearly were delegated to the town manager. And she made the final decisions and that he made a policy. Where do you find that? The town manager's testimony was that she was given the authorization by the town of Marksville to make all decisions regarding the personnel policies and the running of the various departments. She has the hiring and firing decision. She had an ultimate up or down veto power if the police chief made a decision. Yes, Your Honor. So, you know, the vacuum that the town was created with no personnel policies was filled by the town manager and the chief of police by statute. And I see I'm out of time. Yep, you are, but you have a little bit left, I notice, on rebuttal, on the cross-claim. Yes, I have two minutes that I've reserved. Mr. Dunn, you have some re-answer time on the cross-appeal and rebuttal time on your own. Judge Wynne, respectfully, I think you might have dissented in Garcetti v. Ceballos. Your questions indicate discomfort with the notion that a chief receiving complaints about his own conduct can fire an employee for making those complaints and that that termination does not constitute retaliation under the First Amendment. Respectfully, though, that's exactly what Garcetti v. Ceballos says. And the dissenting opinions are quite eloquent in pointing out reasons. Let me make sure that that determination does not constitute retaliation. I thought this was a qualified immunity case. Don't worry about whether or not it's actual retaliation. The question is can you sue these folks? Well, the first element in a qualified immunity analysis is whether there's been any deprivation of a constitutional right at all. That's right. Ultimately, the question is the basis for finding if it's a constitutional violation is to determine whether or not you can sue these people, not to see if, in fact, conduct has been done as bad. That's exactly right. And what Garcetti stands for is the way that we answer that question is by inquiring whether the speech was made pursuant to the employee's duties. I think that's all we have here. I think that, you know, and I understand where you're going with it, and I think your argument is pretty clear. I think that's all you have is a question of making a determination. Is this the kind of speech that's pursuant to duties or is it not speech? Or do you import different other factors to determine, well, this speech is not exactly what he does. You know, it's kind of what a citizen would do. I mean, you have to – there's really not a clear-cut answer to it, but I get your point on it. I'm not – I want you to know that. I get your point. And that's a bright line. We like bright lines on this court, you know, because it makes our job easier, but sometimes I'm not sure bright lines give us the answer. I think there's a point to be made of clarification with respect to the office is too hot situation. And that is that if my office is too hot and I complain about that, then, as my colleague capably noted, that's not protected because that's not a matter of public concern. But what Garcetti – The hypothetical was posed not on whether it's a public concern, whether the person was speaking as a citizen or as an employee. And the distinction is now made in the law. Lane recognized this, that you have to address each separately. And so the question is whether the person's complaint is made as a citizen or as an employee is reflected in the complaint about it being too hot. You still have to demonstrate that it's a matter of public concern. In the case we have before us today, we all agree it's a matter of public concern. But we still have open the tough question of whether the officer spoke as employees or as citizens. I understand. And the way we answer that question is to make a practical inquiry into what the public employee does for a living. What is their job? What do they do all of the time? And as I explained before, what police officers do is they identify the appropriate law enforcement agency to whom to report crimes for investigation. To Judge Diaz's hypothetical where an employee makes a complaint to the assistant chief and gets blown off and then goes to the governor. This does implicate a concern about disruption within the police force, which is the subject of the Pickering balancing. I think it's a little bit unclear in the wake of Garcetti just how much balancing needs to be done, if any, in context of speech that is made pursuant to official duties. I would contend to you that the answer is there is no balancing to be done because you don't even reach that prong of the analysis. Because you first find that the speech was made to pursuant duties. The analysis stops there. And what the Garcetti court explains as the reason for that rule is the theoretical underpinning of the reason for the Pickering balancing. And the interests that are important and the reason we have Pickering balancing is because employees, by virtue of their public employment, do not sacrifice their First Amendment rights. And still retain both an individual interest in commenting upon matters of public concern, as well as the public's own interest in receiving the benefit of vibrant public debate about matters of public concern. And so I think what Garcetti was doing was essentially holding that the potential for disruption by an employee who is speaking pursuant to public duties is inherent. And the court referred specifically to the Sabalas memorandum and said, look, if this calendar deputy writes a memorandum that his superiors perceive as inflammatory or misguided, they are entitled to take disciplinary action against him. And Judge Souter pointed out in his dissenting opinion that that's true even if Sabalas was right. Even if Sabalas correctly pointed out problems and flaws with the way that the office was being administered, his speech as an employee simply is not protected by the First Amendment. Here's what Durham v. Jones made clear. The district court relied upon Durham v. Jones for the proposition that speech about misconduct in a police department is protected. That much, I would suggest to you, was clearly established long before September 2009, as it's analyzed in Durham v. Jones. What's not analyzed in Durham v. Jones, and the reason why we suggest to you that Durham v. Jones represents no relevant change in the law, is that there's no discussion of whether the employee in that context spoke as an employee or as a citizen. And so it was not a new revelation when Durham v. Jones was decided that misconduct in a police department is a matter of public concern. This was discussed in Garcetti itself. It was discussed decades before. How do you distinguish Andrew v. Clark? Is it because that was a statement made to the media? That's one of the major distinguishing features. It's probably the biggest one. What are the others? Andrew v. Clark was decided on a motion to dismiss under Rule 12b-6. And so what the court ruled there was that he'd articulated a claim that could exist. Here we're reviewing a motion for summary judgment where we have evidence on the record. And so, I mean, certainly I agree with Andrew v. Clark that there can be situations in which employee speech is protected under the First Amendment. But the record in this case does not establish the existence of such a claim. I am out of time. There's a legitimate question as to whether you get rebuttal. I was told it would take two minutes. All right. Have we heard everything the counsel has to present? All right. We'll adjourn court for the day. Come down and greet the counsel. This honorable court stands adjourned until tomorrow morning at 930. God save the United States and this honorable court.
judges: Paul V. Niemeyer, James A. Wynn, Jr., Albert Diaz